The next case is Martin Energy v. ING Bank, and Mr. Paulson is here for the appellant. Mr. Paulson, you may begin when you're ready. Thank you, Your Honor. Thank you, Your Honor. Good morning. Good morning. Bruce Paulson for ING Bank. In the face of the global collapse of the O.W. bunker entities in 2014 and O.W. insolvencies that directly affected the parties to this case, the District Court, with the best of intentions, sought to reconstruct a chain of commercial transactions, and the result of that reconstruction is a series of decisions, in this case, which are untenable and call for reversal. So, there are three alternative bases to support the District Court's determination, quantum merit, maritime lien, and contract, and if we find that one is supported by the record, we affirm, right? I believe all three are not supported by the record. But if we find one is, then we are required to affirm, right? If the court finds that there was, for some reason, a maritime lien, yes. If it finds that there was a contract that somehow arose upon the delivery of the fuel in this case, the court could affirm on that basis. That's true. Let me ask you about contract. On page 8 of the District Court's order, the court says, I find there was a contract between Martin and Baldini. Is that a finding of fact that we apply a clearly erroneous standard of review to? I find as a fact that Martin and Baldini did enter into a contract at that time. The terms were these. Martin would provide the previously agreed amount and type of fuel on board the Bravante 8. Baldini would pay Martin's price if the intermediary, who was primarily liable, did not do so. But Martin's only recourse against Baldini would be against the ship. Is that a finding of fact that we apply a clearly erroneous standard of review to? The court based that finding of a contract on subsidiary facts that are subject to the clearly erroneous rule. The ultimate conclusion that those facts give rise to a contract in this case, I believe under Devlin, would be subject to your review. And if indeed the ultimate fact, the conclusion of a contract, is indeed subject to the clearly erroneous rule, the findings are indeed erroneous, in effect, well erroneous, extremely erroneous. In this case, Martin, let me back up, O.W. Bunker was a global supplier of fuel. Ship owners and charters would come to it in order to put fuel on the ships anywhere in the world. In this case, a Brazilian outfit by the name of Baldini threw a O.W. Brazil, which is affiliated with O.W. Middle East, contracted with Baldini to provide the fuel. O.W. Middle East reached out to its U.S. affiliate, O.W. USA, located in Houston, which in turn reached out to Martin Energy, the local supplier. In each case, there's a series of contracts of purchase and sale. There are invoices up and down the chain. ING Bank is a security agent for a consortium of lenders that provided a $700 million revolving credit facility for O.W. Bunker and is the assignee of the receivables of the O.W. Bunker entities, in this case, O.W. Middle East. So you have a chain of contracts. And in that chain of contracts, Martin, whose contract party is the now bankrupt O.W. USA and has a claim in that bankruptcy, provided the fuel. All right. Well, your argument, as I understand it in the brief, was that there's a bunkering certificate, which the ship engineer signed to verify that the fuel was supplied. But that's not a contract. It's just a receipt and a regulatory compliance document. Is that your argument there? That's certainly part of our argument. The fact is, in every fueling, there's a bunker delivery receipt or BDR. But let's move to Quantum Merowith because I think that's the strongest basis for the district court's conclusion. And you know what the elements of Quantum Merowith are. And on page 22 of the district court's order, he says simply, Martin conferred a benefit on Boldini, got the 300 tons of fuel, Boldini knew of, accepted, and retained the benefit. Boldini signed the certificate acknowledging the fuel's delivery, and it would be inequitable for Boldini to retain the benefit without paying for it. Boldini has not sought to do so. Those are findings of fact also that we apply a clearly erroneous standard of review to, right? I mean, how are any of those facts erroneous? Boldini paid into court. It commenced an interclear action. It did not get something for nothing. It paid. It made payment. There's no unjust enrichment. The central element of Quantum Merowith is not there. This is a case, a maritime case, where fuel was put aboard a ship. There have been a whole number of cases arising out of the OW bunker situation, but there are many, many maritime lien cases around the country over the years. There's an underlying principle, going back to the Supreme Court's decision in the Lotta Wanna about uniformity in maritime. Here you have a situation that somehow, based on ... We're looking at state law, though, since Maritime Law doesn't supply an answer. We're looking at the Fourth District Court opinion in Commerce P-Ship. Why wouldn't the Florida subcontractor rule that's articulated in that case apply in this case? Can you give me any principle reason why the subcontractor rule should not apply? Commerce gives a good explanation of Florida Quantum Merowith Law in the construction context. It also says that, in that case, the subcontractor has to exhaust its remedies against the contractor, and there's no Quantum Merowith claim, contract implied, in fact, if, in fact, the owner, in that case the property owner, had paid the general contractor. Because equity, the subcontractor in that case, had not shown that Commerce had not paid the contractor, there was no claim in Quantum Merowith. That's totally consistent with what happened here. Baldini paid into court. It did not seek to take something and retain a benefit without paying for it. It showed up and, to its credit, made that payment. That's tantamount to payment. But payment to whom? If you're right that there is no contract between Martin and Baldini, why can't Martin recover against the money that Baldini deposited into the court on Quantum Merowith grounds? Your clients haven't paid any money in. They want to get money out. And so the Quantum Merit is not against your clients. The Quantum Merit is against the money deposited in the registry of the court. And if there's no contractual relationship between Martin and Baldini, as you say, where's the bar to Quantum Merowith relief? Our client has a contract. Not with Baldini. Yes, it does. Not every one of them. ING is the assignee of O.W. Middle East Contracting with Baldini. It is the only party with a contract with Baldini. I thought you represented all of the O.W. entities. We represent ING Bank, which is not O.W. USA. ING Bank is the assignee of the receivables owed to O.W. Middle East. So our position is consistent with that of O.W. Middle East, the only party in this action with a contract with Baldini. And so what the judge did in... I thought Martin invoiced O.W. USA, right? Correct. And then O.W. USA invoiced O.W. Middle East. Correct. And O.W. Middle East invoiced Baldini, is that right? That's all correct. Okay. And so you have an interpleader situation where the judge has created multiple competing liabilities where, in fact, there should only be one claim. Our claim in contract, if we put the maritime law aside, our claim in contract, that is O.W. Middle East and ING's by assignment against Baldini. The purpose of interpleader is not to extinguish parties' rights. The Martin Energy argues that, and Judge Hinkle cited to, that there's equity in interpleader, but the equity is for the stakeholder. Who's supposed to get the $286,200 instead of Martin, in your view of it? O.W. Middle East, under its contract claim, and ING as its assignee. You're giving any of that money back to Martin? That money would be processed pursuant to United Arab Emirates law in the bankruptcy of O.W. Middle East. So Martin's remedies are in the O.W. USA bankruptcy where the recoveries are robust, which is in Connecticut, its counterparty. Our client's counterparty is Secured Lender, so the answer is you're putting the money into whatever bankruptcy proceeding is appropriate, but you're not sharing any of that money with Martin. The music stopped with insolvency. This is what happens with insolvency. The money that would have gone from Baldini pursuant to its contract with O.W. Middle East comes to a halt at O.W. Middle East in its bankruptcy proceeding. The money does not flow down the chain, and what the judge tried to do was kind of recreate what would have happened if those two bankruptcies hadn't intervened. It seems to me that the judge was simply trying to reach the intended result through the application of quantum merit principles. Baldini pays $290,000, it gets its fuel, Martin gets the $286,200, and the brokers pocket the difference, $3,900. Why wouldn't that be the intended result? Because you can't just take these contracts and put them back together. It's like reconstructing Humpty Dumpty when you have two insolvencies that intervened. Our client still has a contract claim that he extinguished that under the Supreme Court decision in Sanders isn't something you're not supposed to be able to do. Your argument is that that was the intended result. It's just that the law doesn't recognize or allow the district court to get there. It's actually not even the intended result, because what would have happened had there been no bankruptcy is that Baldini would have paid O.W. Middle East 100%. It's not a brokerage claim. There's not a $3,900 commission. These are contracts of purchase and sale, and the same would have been down the line until Martin got paid, and then everybody wouldn't. So that's the intended result. The intended result is for the money to flow all the way through. Yes, of course. You can't deny that. I'm not denying that. I'm saying that's different than what he's saying. You're just saying that legally you can't get there. You can't get there. The music stopped with the bankruptcies, and the district court tried to reconstruct what would have happened had the bankruptcies not intervened, but they did. All right. I think we have your argument, Mr. Paulson. We'll hear from Mr. Young. Thank you. May it please the Court, Michael Young representing the Applee Martin Energy. Judge Hinkle did not simply decide what the fair thing would be and then reverse engineer that result. He instead applied the Florida law of contract and quantum merit and the federal law of maritime liens, and he said, fortunately and fortuitously, that matches what the intended result was. All of the issues on which we rely are questions of fact, and Judge Wilson, you're correct that if the court finds any one of them not to be clearly erroneous, it must affirm without regard to the other two. On the contract claim, Judge Hinkle made his findings based on two key sets of facts. The first is that the contract between the vessel and Martin was not simply a question of logistical arrangements for fulfillment of the preexisting contract between Martin and O.W. Bunker, but rather was a different set of arrangements. The delivery date under the Martin O.W. contract was originally October 18. It was modified by agreement to October 20. When the tugboat got there on October 20, the ship refused to take on the fuel because the shipyard would not pay overtime after 4 p.m., and they said come back the next day. Martin would at that point have had a right to say that's not our deal. We don't want to do that. They might not have done that given that they wanted to make the sale, but they would have had the legal right to do it, and their agreement to do otherwise constituted consideration under Florida law. Second is the bunkering certificate, which is not merely a delivery receipt. Some bunkering certificates may in fact be only delivery receipts, but this one, which is in the record, is much more elaborate than that, and among other things, refers to the ultimate liability of the vessel and incorporates Martin's standard terms and conditions, one of which is an agreement by the so-called purchaser, which is the party receiving the goods and services that is the ship. And so on the basis of those two factual pieces of the record, Judge Schenkel was not clearly erroneous in finding a breach or finding a contract and a breach. With respect to the Quantum Merowit claim, I believe Mr. Paulson, with all respect, is engaging in circular reasoning. Martin sued Boldini on a claim of Quantum Merowit in personam and quasi in rem based on a planned arrest of the Brevante Nine. Before that arrest could happen, Boldini and Brevante appeared and made an interpleader. And the law is clear that where there is an interpleader, the claims against the interpleading party are shifted to claims against the interpled funds. And so if Martin was asserting a Quantum Merowit claim against the shipowner before the interpleader, then it was asserting a Quantum Merowit claim against the interpled funds after the interpleader. So it's circular reasoning to say that by making the interpleader, Boldini made payment and therefore the element of the lack of payment under Quantum Merowit is no longer present. If it was present before as to Boldini, then it was present afterwards as to the interpled funds. We have addressed the other issues relating to Quantum Merowit in our brief. In short, the Commerce Partnership Court did not establish a fifth and sixth element of Quantum Merowit consisting of exhaustion of remedies and nonpayment by the principally liable party. Those last two were factors that went into the fourth element, which is whether it is inequitable for the party that has received the goods or services to retain them without paying for them. Under this circumstance, it was inequitable prior to the interpleader because they had not paid for them. And that claim became transferred into the interpled funds upon the filing of the interpleader. And there will be no inequity to Boldini from an affirmant. They paid once for goods that they received once and they have been made whole. One of the arguments Mr. Paulson makes is that by invoking and applying Quantum Merowit law, the district court essentially extinguished the OW contract, I forget which entity it was, OWUSA, which had contracted with Martin, and he says that the district court improperly extinguished or made null and void that contract. Well, having received payment out of the interpled funds, we would no longer have a claim against OWUSA for the same funds. We've been made whole. As for the OW Empires and ING's derivative claim to those funds, we raised this issue in our brief. At no point has ING said, we had an equal right to share in those funds with Martin and so worst case scenario, the funds should have been divided between us. Both parties tried this case on an all or nothing theory, it's my money, it's not his money, and vice versa. So the fact that OW may also have had a claim to those same interpled funds is not an issue if the court affirms the finding that we had a claim to those funds and vice versa. What's the status of the bankruptcy claim? I'm afraid you'll have to ask Mr. Paulson that. We have a bankruptcy claim on file. The plan provides that our claim is to be reduced dollar for dollar for any money received from the vessel. That would include Judge Hinkle's judgment in this case. We might have, upon satisfaction of the judgment, a residual claim for a tiny bit of interest, but I don't think, frankly, that we're going to recover anything from that. The maritime link issues in this case are fascinating, but frankly, the court doesn't need to reach them unless it has determined to reverse both the contract finding and the quantum Meroweth finding. In short, we believe that Judge Hinkle properly applied the Galehead test. The Galehead test differentiates according to whether the interaction between the supplier, in this case the fuel supplier, and the vessel is significant and ongoing, and significantly the Galehead court says during the pertinent transaction. So if the transaction is a repair process taking months and months, then the interaction must be significant over those months and months. If on the other hand, the transaction is a fueling transaction taking several hours or a day, then the question is, is the interaction significant and ongoing during that time? And here the record shows much more than just, we're here to deliver O.W.'s fuel for them, fine, hook it up here and deliver it, thank you, we're out of here. The same factual proof that goes to the contract and to a limited degree to the quantum Meroweth also tends to establish the significant and ongoing relationship between the parties during the fueling transaction. I think everything else is pretty well set forth in our brief. If the court has any further questions, I'd be happy to entertain them. Otherwise, I'll yield my time. So, I have one question. What happens if legally ING's got a right to a maritime lien and you win on the contract and quantum Meroweth? What happens is, what might have happened is that we would be both entitled to share in those interplaid funds. That claim was waived by ING by not asserting an entitlement to share. It was waived, frankly, by us by not asserting an entitlement to share. So in that situation, you would leave the district court where you found it. You would affirm because they had not established a right to share in our recovery and we had not established a right to share in their recovery. Thank you, Mr. Young and Mr. Paulson. You have reserved some time. Yes, I'll be brief. The contract claim Mr. Young referred to, which, of course, Judge Hinkle said was not free from doubt, Mr. Young said this was not just logistics. This was logistics. In the numerous OW bunker claims that have been litigated around the country, the courts have consistently found that, and it's almost entirely in the maritime lien space, that post-sale logistics, one, don't give rise to some separate contract. The BDR, almost all of which have precisely the same language as Martin's, which is about its boilerplate involving a waiver of lien, which only arises in situations where someone has asserted that the putative lien or has not relied on the credit of the vessel. They put language in their BDRs that make it clear that they're not waiving any lien. You can't contract into a lien. That's black-letter law and it's been upheld over and over and over, including it's referenced in both parties' briefs, it's referenced in the recent Barcliffe decision. But what Judge Hinkle did here is almost like a backdoor lien. He said, by delivering the fuel, and this delivery was not atypical, and Mr. McLellan testified at trial that it was typical. There's often delays and changes in time and where the ship is. So it was a typical delivery. But what Judge Hinkle found in the contract is that the ship had to answer, was the only That sounds like a contract into a maritime lien. You can't contract into a maritime lien. But Kenji, you're not saying that there was no maritime lien at all, right? The maritime lien would be possessed by the contract supplier, which was OW Middle East. Under maritime lien law, there are three requirements. You provide necessary... You're just saying that somebody else had the lien. Our ASINOR, ING's ASINOR, OW Middle East had the lien. But not necessarily because of a contract, because of the delivery of the fuel. Because it met the requirements of the statute. It provided necessaries to the vessel, on the order of the owner, or a person authorized by the owner. Right. Now, let me ask you this question. And I haven't looked at the cases, so I don't know what the answer is. And I just want to know if you have an idea. Judge Hinkle cited a number of cases in which ING had prevailed across the country in these types of claims. Exactly. And he cited five, six, seven of those cases. Did any of those cases address a quantum Merowith scenario? No. There are cases where unjust enrichment claims have been raised, including a number of cases pending before Judge Caproni in the Southern District of New York. But those issues have not yet been litigated. The lien issues have been litigated. So it has been raised. There's actually another case that actually was argued in the Second Circuit on March 15th, where one of the parties, O'Rourke, for fueling in Houston, had raised equitable claims, but had not pleaded them. They were denied below, and I expect they're going to be affirmed, that denial will be affirmed. What about Mr. Young's argument that you've waived the right to share in any funds? I don't quite understand that. Yes, the party said, we said, we have a contract. They said, we have a contract and we have quantum Merowith. Quite frankly, nobody pleaded maritime lien, even though it ended up being the thrust of the case. What really isn't before the court, because there was never any raise here. The fact is, there's a limited stake. The judge discharged. But there is a raise. The raise, when you deposit money in, it takes the place of the raise. That's a black letter maritime law, is it not? The fuel was provided to the Bravanti 8. The Bravanti 8 sailed to Brazil. This action was commenced by Martin under Rule B, which is an attachment in personam action against the Bravanti 9. The Bravanti 9 was named as a defendant, and it was the asset that was attached. So it's quasi-in rem. Quasi-in rem. The lien only attaches to the vessel that the fuel was provided to. And that vessel, as Judge Hinkle said in summary judgment, that ship's not here. So the ship was not before the court. And he said in the same breath that he was going to use the lien arguments to inform himself on the equities. But it's not a lien case. It's not a maritime case. You're quite correct about that. But under Barcliff, Mr. Young talked about significant and ongoing activity. This court in Barcliff just recently said that the delivery of fuel is essentially a one-off. It is not like those repair cases, Marine Coatings and Stevens Tech. A situation where somebody has been engaged for many, many months or even years and had an office on site and worked with the owner of the vessel as if they were employed by them. That's what the Galehead case says. So Barcliff is not binding on us because this is not a maritime case? Barcliff is about maritime liens. If this is not a maritime case, it's not controlling authority. If indeed you consider the maritime lien issues, it is smack on point. I think we have your argument. Thank you, counsel. Court is adjourned. All rise.